UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Tracy Adams
and Paul Adams

    v.                               Civil No. 08-cv-425-JL
                                              Opinion No. 2009 DNH 181

J. Meyers Builders, Inc.

**MEMORANDUM ORDER**

Tracy and Paul Adams have sued J. Myers Builders, Inc. ("Myers") for negligently starting a fire that destroyed their home and its contents. A Myers employee allegedly caused the fire by improperly disposing of material contaminated with a wood preservative, which combusted. Each party moves in limine to preclude certain of the other party's expert witnesses from testifying at the upcoming jury trial; the Adamses have also moved in limine to exclude any reference to their property insurance, which compensated them for some, but not all, of their losses. This court has subject-matter jurisdiction over this matter between the Adamses, Maryland citizens, and Myers, a New Hampshire corporation, under 28 U.S.C. § 1332(a)(1) (diversity).

After oral argument, the court grants the Adamses' motion to exclude Myers's damages experts and any reference to the Adamses' property insurance, and denies Myers's motions to exclude the Adamses' liability and damages experts. Because Myers failed to provide timely reports from its damages experts

as required by Rule 26(a)(2)(B), those witnesses cannot testify at trial by operation of Rule 37(c)(1).  No report was required of the Adamses' damages expert under Rule 26(a)(2)(B), however, and their liability expert employed a sufficiently reliable methodology so as to testify to his conclusions at trial.  Finally, evidence of the Myers's property insurance is inadmissible under Rule 411 of the Federal Rules of Evidence.

**I.   <u>Background</u>**

The Adamses entered into a written contract with Myers to build them a custom home in Littleton, New Hampshire, just north of Franconia Notch in the White Mountains.  While Myers was at work on the house, the Adamses moved into a rental property nearby.  After that property was sold to a third party, requiring the Adamses to move out, Myers agreed to finish one or two rooms in the Littleton house so that the Adamses could begin living there, even though construction was still incomplete.

The Adamses moved their furniture and other belongings into the unfinished home, storing most of the items in the basement. At that point, much of the home had been wired for electricity, including outlet boxes, though the sockets had not been installed.  The Adamses took up residence in one of the bedrooms,

plugging a lamp into an extension cord that Myers employees had run from the house's switchboard.

On July 4, 2007, a day or two after the Adamses had moved in, a Myers employee, William Blay, was at work in a corner of the basement, preparing cedar shakes for installation on the exterior of the home.  This process involved dipping each shake by hand into a five-gallon tub of a Sikkens brand wood preservative, "Cetol SRD," wiping off the excess with a sponge, and placing the shake into another five-gallon tub to dry.  The shakes were then leaned along the basement wall to rest atop strips of cardboard and wood laid over plastic sheeting.  The label on the Cetol container warned that "WASTE SOAKED WITH CETOL SRD MAY SPONTANEOUSLY CATCH FIRE IF IMPROPERLY DISCARDED. IMMEDIATELY AFTER EACH USE, PLACE . . . WASTE IN A SEALED, WATER-FILLED METAL CONTAINER."  Blay did not read this warning, but still knew that wood preservative could spontaneously ignite.

Blay has since stated that, when he finished working that day, he discarded latex gloves and at least one paper towel he had used in the dipping process--and which were contaminated with the preservative--into a plastic garbage bag.  The parties dispute whether Blay discarded only the gloves and a single paper towel that he used to wipe his hands at the day's end, or additional paper towels, and whether Blay left the garbage bag in

3

the area of the basement where he had been working, or disposed of it in a trash bin elsewhere on the property.[1]  Blay has also testified that a piece of the Adamses' furniture, a box spring, had been left leaning up against an outlet box in the area of the basement where he had been working.  The Adamses, however, maintain that there were no electrical outlets or wiring, or even any electrical tools or appliances, in that area, save for an overhead light fixture with no bulb in it.

That night, in the bedroom where the Adamses were staying, Tracy Adams noticed a pungent smell.  Later, on Paul Adams's way to the basement to shut off the lights for the evening, he encountered "grayish-black" smoke coming up the basement stairs. As he descended he saw flames and black smoke emanating from the corner of the basement where Blay had been working.  By the time the Littleton Fire Department had arrived, fire was venting from all windows and doors in the rear portion of the structure. Despite the department's efforts, the fire soon engulfed the whole building, which eventually collapsed.  The entire home and nearly all of its contents were destroyed.

---

[1]This dispute arises from inconsistencies between a statement Blay gave to the investigator for the Adamses' insurance carrier and his deposition testimony.  Neither party has provided either of those documents to the court, however (Myers submitted a portion of Blay's deposition transcript, but it deals with a different subject).

Within the next few days, Timothy Austin, an investigator
retained by the Adamses' property insurer, examined the scene of
the fire and interviewed Blay and the Adamses.  Austin, a
certified fire investigator, has worked in that capacity for more
than 20 years, analyzing the cause and origin of approximately
12,000 fires and testifying in a number of cases in state and
federal court.  Based on his investigation of the fire at the
Adamses' home, Austin determined that the contaminated materials
Blay placed in the garbage bag in the basement had spontaneously
ignited, with the flames quickly spreading to the cedar shakes he
left drying nearby.[2]

In support of this finding, Austin relied on the pungent
odor Mrs. Adams had noticed, which he considered "consistent"
with the debris in the garbage bag "heating up and off-gassing
just prior to flaming ignition," as well as Mr. Adams's account
that he had discovered the fire "in the exact location where Mr.
Blay was dipping cedar shake shingles earlier that day."  Austin
also ruled out all other imaginable causes of the fire, including
an electrical one (he found no sources of electricity near the

---

[2]Ignoring this aspect of Austin's conclusion, Myers
complained at oral argument that Austin failed to explain how a
fire starting in a garbage bag on the floor could have reached
the rafters overhead.

fire's origin) and arson, by the Adamses or someone else (he found no evidence of that, either).

Thus, Austin concluded, Blay had caused the fire by disposing of materials containing the wood preservative in a manner contrary to that specified by the warning label. Austin did not, however, conduct his own test of the potential for the wood preservative to spontaneously ignite, rejecting that step as unnecessary in light of the label—which, in his view, reflected that the manufacturer had already conducted such tests itself.

The Adamses filed a claim with their property insurer, OneBeacon Insurance Company, seeking more than $1 million in losses they sustained in the fire, including nearly $440,000 in lost personal property. Following an analysis by Dean Zwicker, a OneBeacon employee with 25 years' experience adjusting property damage claims, OneBeacon paid the Adamses the maximum available under their policy, which did not entirely cover their loss. The Adamses then commenced this action against Myers, alleging state-law claims of negligence and breach of contract. While OneBeacon is not a party to this action, it enjoys a right of subrogation to whatever they recover against Myers, up to the amount OneBeacon paid the Adamses.

In due course, the parties jointly agreed to a scheduling order, subsequently approved by the court, setting April 13, 2009

and June 12, 2009, as the dates for disclosure of the Adamses'
and Myers's expert witnesses and their reports, respectively.  On
April 13, counsel for the Adamses sent counsel for Myers a
document entitled "Rule 26(a)(2)(A) Disclosure of Expert
Witness," which identified Zwicker as an "experienced property
claims adjuster" who was "expected to testify concerning the
property damages sustained by [the Adamses] in accordance with
his adjuster's reports," which had been previously provided.
The scheduling order also required challenges to expert testimony
to be made at least 45 days prior to trial, which was (and is, no
continuances having been asked or given) set for December 1,
2009.  The discovery period closed on August 7, 2009.  In an
attempt at a pretrial settlement, the parties also appeared
before a private mediator on July 9, 2009.

About one month prior, on June 4, 2009, counsel for Myers
wrote to counsel for the Adamses, explaining, "In anticipation of
the upcoming mediation, I have had an audit of your damage claims
performed by a forensic accountant, Glenn Ricciardelli . . . .  I
do have a preliminary set of schedules from Mr. Ricciardelli's
audit, copies of which are enclosed."  Counsel for Myers also
stated that he had "sent the Adamses' testimony and photographs
of the 'antiques' to an appraiser" and that counsel "expect[ed]
that Mr. Ricciardelli will be testifying at trial as will Mr.

7

Buxton"--who, it turns out, was the appraiser in question--should the mediation prove unsuccessful.

One of schedules enclosed with this letter aggregates the Adamses' payments to the contractors who built the house and lists a "salvage value" for certain materials which were not consumed by the fire, arriving at a value nearly $75,000 less than what the Adamses claimed.  Another schedule represents a "price test" comparing the vendor's list price for 20 different items of personal property lost in the fire--out of some 2,363 different items included in the Adamses' insurance claim--to the value they had claimed, arriving at a "replacement cost ratio [of] 86.06% of the claim."  A third schedule applied this ratio, as well as a 33.14% depreciation figure, to the Adamses' personal property claim, and subtracted the outstanding payments to the contractors and the "salvage value" from the Adamses' real property claim.  Apart from a series of seven brief footnotes at the bottom of the third schedule, these documents do not otherwise explain Ricciardelli's calculations.

The next day, Myers's counsel sent another letter to the Adamses' counsel, enclosing a "report from Bruce A. Buxton, together with a brochure describing his credentials."  In relevant part, the brochure states that Buxton "has more than 38 years of experience conducting antiques appraisals and auctions

throughout the United States" which exceed $50 million in value annually.  The brochure continues:

> Mr. Buxton conducts appraisals primarily for the purposes of insurance, estates, and fair market values. His client list also includes museums, historical societies and many private collections. In order to assure the most up to date values, Mr. Buxton's documentation is based on his extensive personal research library, electronic databases and a network of experts highly qualified in their special fields of knowledge.

Buxton's accompanying report describes itself as his "observations and questions based on [his] professional judgment of 39 years and appraisals exceeding $150,000,000 per year."  The report consists of a list of approximately 35 items lost in the fire, each accompanied by a note questioning the character or value of that item as reported by the Adamses.  For an item reported as "Antique chair ($800)," for example, Buxton notes, "one in picture appears to be turn of the century, for $800 it would need to be a Chippendale piece of the period, c.1770."  For other items, Buxton quotes a lower price, sometimes based on recent sales at auction but in most cases unexplained.

The Adamses did not receive any additional information on either Ricciardelli or Buxton or their opinions in this matter until October 30, 2009, when Myers filed its objection to the Adamses' motion to preclude those witnesses from testifying at trial due to Myers's failure to provide the expert disclosures

required by Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.[3]  The objection attached Ricciardelli's curriculum vitae, claiming that it had been "inadvertently omitted" when his schedules had been forwarded to Adamses's counsel nearly five months prior, as well as a list of cases in which Riccardelli has provided expert testimony.  As to Buxton, the objection simply reiterated the summary of his experience that appears in his brochure, adding that he "had not testified in the past 10 years and neither [he nor Ricciardelli] has related publications."

## II.  **Analysis**

As noted at the outset, each party has moved in limine to preclude certain of the other's expert witnesses from testifying at trial:  the Adamses seek to exclude any testimony by Ricciardelli or Buxton, and Myers seeks to exclude any testimony by Austin or Zwicker.  The Adamses also move to preclude any reference to their property insurance at trial.

---

[3]On September 15, 2009, counsel for Myers provided counsel for the Adamses with an "updated" set of schedules from Ricciardelli.  This set added a fourth schedule purporting to summarize the values of the claimed antiques and collectibles included in Buxton's report, arriving at a "price test" ratio of 44.01%.  In the updated schedules, Ricciardelli applies this reduction to the Adamses's claimed loss of antiques and collectibles, and the 86.06% ratio to the remainder of the Adamses' claimed personal property loss.

As explained fully <u>infra</u>, the court agrees with the Adamses that Myers failed to provide a timely expert report from either Ricciardelli or Buxton as required by Rule 26(a)(2)(B), and that this failure prevents Myers from calling those witnesses at trial under Rule 37(c)(1), because it was not substantially justified, harmless, or deserving of some lesser sanction.  But the court rejects Myers's similar challenge to Zwicker's testimony, because no Rule 26(a)(2)(B) report was required of him as a non-retained expert.  The court also rejects Myers's challenge to Austin's testimony on the ground that it is not based on a reliable methodology as required by Rule 702 of the Federal Rules of Evidence.  Finally, subject to potential developments at trial, Rule 411 of the Federal Rules of Evidence (or, if not, the collateral source rule) prevents Myers from making reference to the Adamses' property insurance.

## A.   **Ricciardelli and Buxton**

The Adamses move to prevent Ricciardelli and Buxton from testifying at trial because Myers failed to provide expert reports by them within the deadlines set by the scheduling order.[4]  Rule 26(a)(2) requires a party to "disclose the identity

---

[4]The Adamses also challenge Ricciardelli and Buxton on the ground that the materials Myers has provided fail to establish their qualifications or bases for their opinions so as to enable

of any witness it may use at trial to present evidence under
Federal Rule of Evidence 702," Fed. R. Civ. P. 26(a)(2)(A), and,
"if the witness is one retained or specially employed to provide
expert testimony in the case," then the "disclosure must be
accompanied by a written report--prepared and signed by the
witness," Fed. R. Civ. P. 26(a)(2)(B).  These disclosures must
occur "at the time . . . the court orders," Fed. R. Civ. P.
26(a)(2)(C), which, for Myers's experts, was June 12, 2009.

Under Fed. R. Civ. P. 26(a)(2)(B), an expert report must
contain "(i) a complete statement of all opinions the witness
will express and the basis and reasons for them, (ii) the data or
other information considered by the witness in forming them,
(iii) any exhibits that will be used to summarize or support
them, (iv) the witness's qualifications, including a list of all
publications authored in the previous ten years, (v) a list of
all other cases in which, during the previous four years, the
witness testified as an expert at trial or deposition, and (vi) a
statement of the compensation to be paid for the study and
testimony in the case" (formatting altered).

The materials provided to the Adamses' counsel prior to the
mediation omitted much of this data:  they failed to give

---

them to testify under Rule 702 of the Federal Rules of Evidence.
The court does not reach that argument.

12

Ricciardelli's or Buxton's qualifications (apart from the brief references to Buxton's "38 years of experience" and his "client list"), to list other cases in which they had testified in the past four years, or to reveal their compensation for their work on this case. None of this information, in fact, was provided until Myers filed its objection to the Adamses' motion to exclude Buxton and Ricciardelli--more than four months after the applicable deadline--and even that filing does not disclose what they were paid or, in Buxton's case, any additional detail about his qualifications. Courts have routinely found would-be expert reports wanting under Rule 26(a)(2)(B) for leaving out the required information as to the witness's qualifications, testimony in other cases, or compensation. See, e.g., Pell v. E.I. DuPont De Nemours & Co., 231 F.R.D. 186, 193 (D. Del. 2005); Rivera Pomales v. Bridgestone Firestone, Inc., 217 F.R.D. 290, 293 (D.P.R. 2003); Dunkin' Donuts Inc. v. Patel, 174 F. Supp. 2d 202, 213 (D.N.J. 2001); Campbell v. McMillin, 83 F. Supp. 2d 761, 765 (S.D. Miss. 2000); Ruhland v. Walter Kidde Portable Equip., Inc., 179 F.R.D. 246, 249 (W.D. Wis. 1998).

Moreover, the materials given to the Adamses' counsel about Ricciardelli and Buxton by the deadline lacked the "complete statement of all opinions the witness[es] will express and the basis and reasons for them" and "the data or other information

considered by the witness[es] in forming them" as also expressly required by Rule 26(a)(B)(2).  While Ricciardelli explains certain elements of his calculations--for example, he notes that he obtained data on the payments to the building contractors from invoices on file with Myers--he also leaves crucial parts of them wholly unexplained--for example, he does not say why he chose fewer than one percent of the items lost in the fire, nor why he chose the particular items he did, as the basis for his "price test" reducing the value of the Adamses' personal property claim by nearly 15 percent.  And Buxton offers simply his "observations and questions based on his professional judgment," citing to specific information, such as recent sales at auction, for only a handful of items.  For the vast majority, he just questions the character of the item as reported by the Adamses and asserts a lower price without explaining how he came to those conclusions.

Ricciardelli's and Buxton's reports, then, contain neither the information about the witnesses required by subparts (iv), (v), and (vi), nor the information about their opinions required by subparts (i) and (ii), of Rule 26(a)(B)(2).  See Pell, 231 F.R.D. at 193 (finding an expert report insufficient for failing to state witness's employment history, publications, other cases where he had testified, or compensation, or to explain "how or why he chose [the] numbers" underlying his economic projections).

14

Having failed "to identify a witness as required by Rule 26(a),"
Myers is "not allowed to use that . . . witness . . . at a trial,
unless the failure was substantially justified or is harmless."
Fed. R. Civ. P. 37(c)(1).  But "it is the obligation of the party
facing sanctions for belated disclosure to show that its failure
to comply with the Rule was either justified or harmless."
Wilson v. Bradlees of New Eng., Inc., 250 F.3d 10, 21 (1st Cir.
2001).  Myers has not carried that burden here.[5]

    Myers's harmlessness argument depends largely on its view
that, prior to the mediation, it disclosed "sufficient
information regarding its experts' opinions so that [the
Adamses'] counsel would be able to explore those opinions before
the end of discovery and the deadline for filing dispositive
motions" such that Myers "complied with the intent of the expert
disclosure rule" (internal quotation marks omitted).  The short
answer to this argument is that Rule 26(a)(2)(B) itself specifies
what information makes up a "sufficient" expert report and
therefore accomplishes the rule's "intent."

    To be sure, courts have occasionally deemed minor deviations
from the requirements of Rule 26(a)(2)(B) "harmless" under Rule
37(c)(1), such as the expert's failure to sign the report, when

---

[5]Myers has made no substantial justification claim, either
in its filings or at oral argument.

15

he later adopted it by affidavit, see, e.g., Jenkins v. Bartlett, 487 F.3d 482, 488 (7th Cir. 2007), or the absence of court names and docket numbers from the initial list of cases in which the expert previously testified, when that data was later provided by supplementation, see, e.g., Zollinger v. Owens-Brockway Glass Container, Inc., 233 F. Supp. 2d 349, 356 (N.D.N.Y. 2002).  But the wholesale omission of one or more of the categories of information demanded by the rule, as here, almost inevitably leads to preclusion.  See, e.g., Solid Gold Casino Hotel & Resort of Tunica v. Miles, No. 02-2863, 2004 WL 5499007, at *3 (W.D. Tenn. Dec. 14, 2004); Dyett v. N. Broward Hosp. Dist., No. 03-60804, 2004 WL 5320630, at *2 (S.D. Fla. Jan. 21, 2004); Rivera Pomales, 217 F.R.D. at 293; Ass'n for Disabled Ams. v. Claypool Holdings, LLC, No. 00-0344, 2001 WL 1112109, at *12 (S.D. Ind. Aug. 6, 2001); Ruhland, 179 F.R.D. at 250.  Myers provides no authority to the contrary.

These cases are consistent with the guidance from the court of appeals cautioning that Rule 37(c)(1) "requires the near automatic exclusion of Rule 26 information that is not timely disclosed," Wilson, 250 F.3d at 20, and describing the "harmlessness" exception as but a "narrow escape hatch" in the case of noncompliance with Rule 26(a)(2)(B), Lohnes v. Level 3 Commc'ns, Inc., 272 F.3d 49, 60 (1st Cir. 2001).  As the circuit

has also recognized, the expert disclosure requirements
"promote[] fairness both in the discovery process and at trial"
by "better preparing attorneys for cross-examination, minimizing
surprise, and supplying a helpful focus for the court's
supervision of the judicial process."  Thibeault v. Square D Co.,
960 F.2d 239, 244 (1st Cir. 1992); see also Fed. R. Civ. P.
26(a)(2) advisory committee's note (1993).

    These purposes are clearly frustrated by disclosures, like
Myers's, that tell the opposing party nothing about a witness's
qualifications, prior testimony, or compensation, and not enough
about the bases or reasons for his opinions or the data he used
in forming them.  See, e.g., Rivera Pomales, 217 F.R.D. at 292-93
(explaining how failing to produce an expert's qualifications
hamstrings an adversary's investigation and preparation of its
case).  Moreover, where, as here, these facts are not disclosed
until just one month before trial and after the discovery cutoff
has long since passed, the harm to the opposing party is
manifest.  See Lohnes, 272 F.3d at 60 (finding that plaintiff's
failure to disclose his expert until after defendant moved for
summary judgment "deprived [it] of the opportunity to depose the

proposed expert, challenge his credentials, solicit expert opinions of its own, or conduct expert-related discovery").[6]

Myers nevertheless complains that, not only did its inadequate expert disclosures fail to prejudice the Adamses, but the Adamses' "failure to object" to the disclosures prior to moving in limine to prevent the experts from testifying actually prejudiced Myers "by not giving [it] the opportunity to correct any omissions."[7]  This argument also has a short answer:  the jointly proposed scheduling order, approved by the court, did not

---

[6]While Myers is correct that, in Lohnes, the plaintiff failed to disclose even the identity of his would-be expert witness until after the close of discovery, the difference between that case and this case is one of degree, rather than kind.  An incomplete expert disclosure is less harmful than no expert disclosure, to be sure, but it is harmful nonetheless and, as just noted, courts routinely prevent expert witnesses from testifying due to incomplete disclosures, not just missing ones.

[7]Myers also claims "prejudice" from "the informal nature of the [Adamses'] disclosure of Zwicker.  As explained infra at Part II.B, however, that disclosure was not subject to the requirements of Rule 26(a)(B)(2), because Zwicker was not "retained or specially employed to provide expert testimony in the case" nor do his "duties as [a] party's employee regularly involve giving expert testimony."  At oral argument, Myers complained that the expert report by Austin--who was specially retained to testify in this matter and therefore is subject to Rule 26(a)(2)(B)--was also inadequate.  Because that point was not raised until then (Myers moved to exclude Austin due to his allegedly unacceptable methodology only, see infra Part II.C) this court need not consider it.  See Doe v. Friendfinder Network, Inc., 540 F. Supp. 2d 288, 304 n.19 (D.N.H. 2008).  The argument is without merit anyway, as even a cursory comparison of Austin's comprehensive report to the fragmentary materials provided by Ricciardelli and Buxton makes clear.

require either party to make its objections to expert testimony until 45 days before trial, so the Adamses' "failure" to do so sooner is of no consequence.

Indeed, exclusion of inadequately disclosed expert testimony under Rule 37(c)(1) "is automatic in the sense that there is no need for the opposing party to make a motion . . . to compel a further disclosure as a predicate for imposition of the sanction."  8A Charles Alan Wright, et al., Federal Practice and Procedure § 2289.1, at 704 (2d ed. 1994).  That the Adamses waited until the agreed-upon deadline to point out the shortcomings of Myers's expert disclosures, then, has no bearing on the harmlessness analysis.  Myers provides no authority for its contrary view, which would effectively shift the responsibility to ensure adequate expert reports from the party seeking to call those experts to its adversary, and has been rejected by other district courts in this circuit.  See Rivera Pomales, 217 F.R.D. at 293; Piester v. Int'l Bus. Machs. Corp., 929 F. Supp. 595, 599 (D.R.I. 1996).

The court concludes that Myers's failure to provide timely expert reports by either Ricciardelli or Buxton containing the information required by Rule 26(a)(2)(B) was neither substantially justified nor harmless under Rule 37(c)(1). Finally, though the rule authorizes other sanctions "instead of"

excluding inadequately disclosed witnesses, that sanction, again, is "near automatic," and the party in violation has the burden to show that some lesser sanction is appropriate. <u>Wilson</u>, 250 F.3d at 20-21. Myers has not taken on that burden here, but in any event none of the other sanctions specifically authorized by Rule 37(c)(1), e.g., ordering the payment of attorneys' fees caused by the inadequate disclosure, or informing the jury of it, is appropriate. The Adamses' motion to preclude Ricciardelli and Buxton from testifying is granted.

### B.   Zwicker

For its part, Myers moves to prevent one of the Adamses' expert witnesses, Zwicker, from testifying at trial because they failed to provide an expert report from him. Rule 26(a)(2)(B), however, demands a report only "if the witness is one retained or specially employed to present expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony."[8] Zwicker, who adjusted the Adamses' personal

---

[8]At oral argument, Myers suggested that Rule 26(a)(B)(2) applies to Zwicker because he is employed by OneBeacon, which is not a party to this action. That Zwicker is not employed by a party, however, does not mean that he was "specially retained to present expert testimony," which is the trigger for the expert report requirement. Employment by a party matters only insofar as it "regularly involve[s] giving expert testimony," which Zwicker's employment does not. And, even if it did, the fact that Zwicker works for a non-party would seem to make this second

property claim on behalf of his employer, OneBeacon, fits neither
of those categories, so, under Rule 26(a)(B)(2)(A), no expert
report was required of him; all that was required, under Rule
26(a)(B)(2)(B), was that the Adamses "disclose to the other
parties [Zwicker's] identity" as "a witness [they] may use at
trial to present evidence under Federal Rule of Evidence 702."
The Adamses did that, by the applicable deadline, when they
provided Myers with their "Rule 26(a)(2)(A) Disclosure of Expert
Witness," described in Part I, <u>supra</u>.

   As this court has observed, "'[w]hile all experts must be
disclosed under Rule 26(a)(2)(A), only "retained" experts must
provide Rule 26(a)(2)(B) reports.'" <u>Aumand v. Dartmouth
Hitchcock Med. Ctr.</u>, 611 F. Supp. 2d 78, 88 (D.N.H. 2009)
(quoting <u>Sprague v. Liberty Mut. Ins. Co.</u>, 177 F.R.D. 78, 81
(D.N.H. 1998)); <u>see also</u>, <u>e.g.</u>, 8 Wright, <u>supra</u>, § 2031.1, at 441
n.6 (quoting Fed. R. Civ. P. 26(a)(2) advisory committee's note
(1993)) & 2009 supp. at 228-29 ("as to nonretained expert
witnesses, the obligation to identify such persons as witnesses
who will be presenting expert testimony under Rule 26(a)(2)(A)
applies <u>although there is no corresponding report requirement</u>"
(emphasis added; footnote omitted)).  This proposition is

_____

trigger for an expert report--a witness "whose duties as <u>the
party's</u> employee regularly involve giving expert testimony"--
inapplicable here, not the other way around.

apparent from the language of the rule itself and not at all controversial.[9]  Because the Adamses complied with the only expert disclosure requirement applicable to Zwicker, Myers's motion to exclude him on that basis is denied.[10]

### C.   Austin

Myers also moves to prevent another of the Adamses' expert witnesses, Austin, from appearing at trial, arguing that his testimony does not meet one of the requirements under Rule 702 of the Federal Rules of Evidence.  That rule provides that:

> If scientific, technical, or other specialized
> knowledge will assist the trier of fact to understand
> the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is
> based upon sufficient facts or data, (2) the testimony
> is the product of reliable principles and methods, and

---

[9]A question often arises as to whether percipient witnesses who happen to be experts--usually a plaintiff's treating physicians in a case involving personal injury--are subject to even the expert disclosure requirement of Rule 26(a)(2)(A) because their personal knowledge of the events at issue includes their expert opinions.  See, e.g., Aumand, 611 F. Supp. 2d at 88 & n.8.  But that question is not implicated here:  the Adamses admittedly plan to have Zwicker offer expert testimony and, as a result, the disclosure requirement of Rule 26(a)(2)(A) applies. The report requirement of Rule 26(a)(2)(B), though, does not.

[10]Of course, the fact that Zwicker was not required to submit a report stating the bases and reasons for his conclusions and the like does not relieve the Adamses of their burden to elicit that information at trial in qualifying him to give expert testimony under Rule 702.

    (3) the witness has applied the principles and methods
    reliably to the facts of the case.

Fed. R.  Evid. 702.  As the structure of this rule suggests,

before the factfinder in a case can consider expert testimony

over the adverse party's objection, the trial judge, serving as

"gatekeeper," must determine whether the testimony satisfies the

relevant foundational requirements.  See Daubert v. Merrell Dow

Pharms., Inc., 509 U.S. 579, 597 (1993).

    Here, the only foundational requirement which Myers

questions is whether Austin's opinion--that the fire was caused

by the spontaneous ignition of material, contaminated with the

wood preservative, that Blay improperly placed in a garbage bag

in the basement--is "the product of reliable principles and

methods."[11]  Austin explains that he conducted his investigation

according to the National Fire Protection Association's Guide for

---

[11]While Myers does not explicitly challenge the "facts and
data" underlying Austin's opinion, its motion and presentation at
oral argument raised some of the disputes noted in Part I, supra,
e.g., how much contaminated material Blay placed in the bag, and
whether Blay in fact left the bag in the basement.  Austin's
report indicates, however, that he based his findings as to
Blay's actions on a recorded statement he gave Austin in the days
following the fire.  As mentioned supra at note 1, that statement
has not been provided to the court, so it has no basis for
questioning the accuracy of Austin's account of what Blay told
him, even if Blay did in fact give a different account in his
deposition.  In any event, "[w]hen the factual underpinning of an
expert opinion is weak, it is a matter affecting the weight and
credibility of the testimony," rather than its admissibility.
Newell P.R., Ltd. v. Rubbermaid, Inc., 20 F.3d 15, 20 (1st Cir.
1994) (internal quotation marks omitted).

<u>Fire and Explosion Investigations</u>, known as NFPA 921.  Myers does not question that NFPA 921 represents a reliable methodology for investigating the cause of fires, but argues that Austin strayed from it by failing to conduct any experimental testing of his spontaneous ignition hypothesis.

As the Adamses point out, however, NFPA 921 specifically states--in Chapter 4.3.6--that once the investigator develops a hypothesis, it is tested "by the principle of deductive reasoning, in which the investigator compares his or her hypothesis to all known facts.  <u>This testing of the hypothesis may be either cognitive or experimental</u>" (internal cross-reference omitted; emphasis added).  Consistent with this language, courts have ruled that NFPA 921 does not, in fact, require experimental testing of a fire investigator's hypothesis as to cause, and have rejected challenges to opinion testimony based on an expert's failure to do so.  <u>See</u> <u>Shuck v. CNH Am., LLC</u>, 498 F.3d 868, 875 n.3 (8th Cir. 2007) (clarifying that NFPA 921 provides no "bright-line rule that expert opinions in fire cases always must be supported by testing to be admissible"); <u>see also</u> <u>Westfield Ins. Co. v. J.C. Penney Corp.</u>, 466 F. Supp. 2d 1086, 1094 (W.D. Wis. 2006) (rejecting challenge to fire investigator's opinion testimony based on his failure to perform tests).  Myers provides no authority to the contrary, in the form

24

of either judicial decisions interpreting NFPA 921 or an opinion
from another expert that experimental testing is required by NFPA
921 or any other reliable methodology of fire investigation.

Furthermore, Austin explains (in an affidavit submitted with
the Adamses' objection to Myers's motion to exclude him) that
testing "the potential for the Sikkens sealer/stain product to
spontaneously ignite" was unnecessary "since the manufacturer
already conducted those tests" in deciding to place a label on
the product warning of that very danger.  Austin's "failure" to
conduct experimental testing of his spontaneous ignition
hypothesis, then, did not render his methodology unreliable under
Rule 702 so as to require the exclusion of his opinion.

Myers also attacks Austin's opinion because "he contends
that he considered and ruled out other possible sources of
ignition, including electrical ignition--for which there is as
much evidence as spontaneous combustion--without doing any
testing or even specific investigation."  As an initial matter,
though, Myers does not identify the "evidence" for electrical
ignition, apart from Blay's claim at his deposition that a box
spring had been left lying against an outlet cover in the
basement.  Assuming, <u>dubitante</u>, that this scenario creates any
risk of fire (Myers presents no evidence to that effect, and the
court has difficulty with the notion that a piece of furniture in

contact with an outlet box can somehow catch fire), the Adamses dispute that the scenario existed, at least anywhere near the fire's origin, and Austin was certainly not obligated to accept Blay's account in forming his opinions, given the evidence to the contrary.  See also note 10, supra.  Nor, as just explained, was Austin required to perform tests in order to eliminate other imaginable causes of the fire.

Moreover, Austin states in his affidavit that he ruled out "every possible cause of the fire" aside from spontaneous ignition of the sealant, including an electrical one, because there were no electrical outlets, wiring, tools, appliances, or devices in the area of the fire's origin.[12]  That sufficiently explains Austin's conclusion so as to make it admissible at trial under Rule 702 and Daubert.  See Westfield, 466 F. Supp. 2d at 1094 ("one of the proper ways for an expert to identify the source of a fire is by eliminating other potential sources").  Myers's motion to exclude Austin's testimony is denied.

---

[12]While Austin's report did not contain this specific explanation, Myers's motion did not seek to exclude his testimony based on deficiencies in his report, but deficiencies in his methodology.  See note 5, supra.

### D.   Evidence of the Adamses' property insurance

Finally, the Adamses move to prevent Myers "from introducing or eliciting testimony or evidence concerning [their] insurance coverage," arguing that it is both irrelevant under Rule 401 and unduly prejudicial under Rule 403 of the Federal Rules of Evidence.  Myers, in response, argues that the Adamses' property insurer "is the major party in interest" in this case by virtue of its subrogated right to any recovery up to what it paid the Adamses.  Myers also argues that Zwicker, whom the Adamses intend to call to testify as to the amount of their loss, valued that loss in his capacity as an adjuster for their property insurer.

Myers's first argument is incorrect.  The property insurer, OneBeacon, has not been named as a party to this action and, as the Adamses point out, need not have been.  Under federal law, which controls the question of who is the real party in interest here, "if the insured is only partially compensated by the insurer, both the insurer and the insured are real parties-in-interest" in an action against the party allegedly responsible for the loss and, as a result, either the insurer or the insured (or both) may serve as the plaintiff.  Brocklesby Transp. v. E. States Escort Servs., 904 F.2d 131, 133 (2d Cir. 1990) (citing United States v. Aetna Cas. & Sur. Co., 338 U.S. 366, 380-82 (1949)); see also, e.g., 20 Wright, supra, § 75, at 665.

27

While some (but not all) courts nevertheless allow a defendant to compel joinder of the insurer under these circumstances, <u>see</u> 20 Wright, <u>supra</u>, § 75, at 655 & n.14, Myers has not moved to do so, but only mentioned this issue in its objection to the Adamses' motion in limine, <u>cf.</u> L.R. 7.1(a)(1) ("Objections to pending motions and affirmative motions for relief shall not be combined in one filing.").  In any event, it would be too late, because the scheduling order set January 19, 2009 as the deadline for joinder of additional parties, and trial is imminent.  <u>See</u> <u>Cabrera v. Municip. of Bayamon</u>, 622 F.2d 4, 6 (1st Cir. 1980) (noting court's "discretion to refuse an attempt to join a new party at [a] late stage of the litigation").

Myers's second point, however, is well-taken.  Under the Federal Rules, "[e]vidence that a person was or was not insured against liability is not admissible upon the issue of whether the person acted negligently or otherwise wrongfully," but the rule, by its terms, "does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as . . . bias or prejudice of a witness."  Fed. R. Evid. 411.  So the fact that OneBeacon paid the Adamses for part of their loss--and stands to recover that payment through any award made in this case--can be used to show the bias or prejudice of Zwicker, who works for OneBeacon, in testifying to the amount of

that loss.  See Conde v. Starlight I, Inc., 103 F.3d 210, 214
(1st Cir. 1997) (upholding references to witness as an "adjuster"
over a Rule 411 objection where his credibility was at issue due
to his employment by the defendant's liability insurer).

Implicitly conceding this point, the Adamses say, in reply
to Myers's objection, that they no longer intend to call Zwicker
as a witness, except in rebuttal to any testimony as to the value
of their loss given by Ricciardelli or Buxton.  Given this
court's ruling that those witnesses cannot testify, see Part
II.A, supra, Zwicker will not be testifying either, closing off
the only possible avenue Myers has identified for admitting
evidence of the Adamses' insurance coverage at trial.[13]  That
evidence is inadmissible under Rule 411,[14] and the Adamses's

---

[13]The court notes that OneBeacon also hired Austin, so the
company's interest in the outcome could potentially be used to
show his bias or prejudice, but Myers has not made that argument.

[14]It could be argued that Rule 411 does not apply, either
because the Adamses were insured not against "liability," but
casualty, or because evidence of their coverage would not be used
to show they acted "negligently or otherwise wrongfully" (though
that begs the question of how that evidence would in fact be
used).  But a leading evidence treatise takes the view that
evidence of insurance is inadmissible under Rule 411 even "when
used against a plaintiff, since it suggests that he or she has
already been compensated, and either that the plaintiff is
seeking a double recovery or that the real party in interest is
the subrogated insurer"--which, as just discussed, appears to be
Myers's only reason for wanting to introduce that evidence here.
2 Weinstein's Federal Evidence § 411.03[3], at 411-9--4-11-10
(Joseph B. McLaughlin, ed., 2d ed. 1997).  Even if Rule 411 did
not apply, moreover, evidence of the Adamses' property insurance

motion to exclude it is granted, subject to potential developments at trial.  Cf. Fitzgerald, 177 F.3d at 73 (upholding ruling that plaintiff opened the door to evidence of health insurance by testifying that medical expenses occasioned by the injury had exerted a financial strain).

### III. **Conclusion**

For the foregoing reasons, the Adamses' motions to preclude testimony by Ricciardelli and Buxton[15] and evidence of their property insurance[16] are GRANTED and Myers's motions to preclude testimony by Zwicker[17] and Austin[18] are DENIED.

---

would still be inadmissible under New Hampshire's collateral source rule, for much the same reason.  As this court has recognized, evidence that a plaintiff has insurance coverage for his complained-of injuries causes an unacceptable risk that the jury "'may be unduly inclined to return either a defendant's verdict or an artificially low damage award.'"  Aumand, 611 F. Supp. 2d at 92 (quoting Fitzgerald v. Expressway Sewerage Constr., Inc., 177 F.3d 71, 73 (1st Cir. 1999)).

[15]Document no. 17.

[16]Document no. 26.

[17]Document no. 19.

[18]Document no. 18.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:   December 2, 2009

cc:   John P. Sherman, Esq.
      William E. Gericke, Esq.
      Andrew D. Dunn, Esq.